# United States Bankruptcy Court
# District of Massachusetts
# Western Division

_____
                                                )
In re:                                          )
                                                )
MATTHEW J. MULLARKEY and    )          Chapter 7
NICOLE M. MULLARKEY,              )          Case No. 07-30561-HJB
                                                )
        Debtors.                            )
_____ )
                                                )
CHRISTINE GREENE,                   )
                                                )
        Plaintiff,                           )
                                                )
v.                                              )          Adversary Proceeding
                                                )          No. 08-03009
                                                )
MATTHEW J. MULLARKEY and    )
NICOLE M. MULLARKEY,              )
                                                )
        Defendants.                       )
_____ )


## <u>MEMORANDUM OF DECISION</u>

Before the Court for determination is a Complaint filed by Christine Greene

("Christine" or the "Plaintiff") in which she seeks a determination that her claim against

debtors Matthew J. Mullarkey and Nicole M. Mullarkey (individually "Matthew" or "Nicole";

or together, the "Mullarkeys" or the "Defendants") is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6).[1]

## I.   FACTS AND TRAVEL OF THE CASE

With a renewed respect and admiration for the work done by the Massachusetts Probate and Family Court, this Court makes its findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, based upon the witnesses' testimony and the exhibits admitted into the record.

What we have here is an intra-family feud.  Five witnesses testified at trial - Lenore Mullarkey, Susan LeBlanc ("Susan"), Christine, and the Mullarkeys.  Lenore Mullarkey is mother to three children, Matthew, Christine and Susan, in addition to five others.  Matthew is married to Nicole.  Christine is married to Todd Greene ("Todd").  The immediate object of the friction between Lenore Mullarkey, Matthew, Nicole, Christine, Todd and Susan is a two-family residential property located at 11 Fowler Avenue in Westfield, Massachusetts (the "Fowler Property" or "11 Fowler").  And, in addition to their differences relating to ownership of that property, that friction has played out on or in the property's porch, attic, basement, garage, yard and in-ground pool.

Lenore Mullarkey acquired the Fowler Property in approximately 1973, incident to her marital dissolution.  On August 13, 1992, she executed a quitclaim deed, granting title to the property to herself and children Edward J. Mullarkey, Jr., George J. Mullarkey,

---

[1]  Unless otherwise indicated, all references to the "Bankruptcy Code" or to specific sections therein are to Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8 ("BAPCPA").

Matthew and Christine as joint tenants.  In 1997, title to the property was transferred to Matthew, Christine and Susan, as joint tenants, subject to the outstanding mortgage on which Lenore Mullarkey remained solely obligated.

As of 1997, Susan inhabited the second floor of the Fowler Property.  The first floor was employed as a rental unit for college students.  Susan was responsible for collecting the rent and paying the mortgage, oversaw property repairs, and addressed tenant concerns.  In September 1999, Susan moved out of the Fowler Property and Christine and her three children relocated to the first floor.  This time, the second floor was rented to others.  Christine assumed the responsibilites previously undertaken by Susan and, when tenant payments were untimely, Christine would make or advance the mortgage payments from her own funds.

Soon after moving to 11 Fowler, Christine identified the roof as in need of repair. Although initially declining to help, Matthew, then in California, agreed in 2003 to come to Massachusetts to make the necessary repairs himself, so long as Christine's boyfriend and then future husband, Todd, agreed to advance payment for the Mullarkeys' family travel expenses to Massachusetts and the cost of all roofing materials associated with the repairs. Christine estimates that Todd personally contributed approximately $8,000 to $10,000, inclusive of the Mullarkeys' travel expenses, toward the 11 Fowler roof repair.  In July 2003, in order to secure repayment of the funds he had advanced, Todd had an attorney draft a

mortgage on the Fowler Property in the amount of $10,000.  However, the mortgage was never executed by the sibling property owners.[2]

Late in 2003, Matthew lost his job in California, sold his residence, and permanently moved his family to Massachusetts.  For approximately six months throughout the winter and spring of 2004, the Mullarkeys rented an apartment from another of Matthew's siblings in Huntington, Massachusetts.

**The "Agreement":**  In the spring of 2004, Christine and Matthew discussed acquiring Susan's interest in 11 Fowler.  Christine testified that she, Matthew and Susan had several conversations regarding this proposal.  Initially, Susan was not interested in giving up her interest in the property; but, pressured by her mother, she finally agreed to convey her interest to her co-owner siblings for the sum of $15,000, less than the amount to which she thought she was entitled.  According to Susan, her mother intended 11 Fowler to be thereafter held in the names of both Christine and Matthew.  In her own testimony, Lenore Mullarkey confirmed that intention.

Christine testified that she and Matthew then entered into an oral agreement for the purpose, she was told, to more easily finance the property.  According to Christine, Matthew represented to her that financing terms would be more favorable if she transferred her interest in 11 Fowler to him; and then, after completion of the financing and after her marriage to Todd, she would be added back as an owner.  Christine testified that she did

---

[2]  At trial, Susan testified that she declined to sign the mortgage because she felt betrayed; she had contributed significant funds for repairs of 11 Fowler but had not received assistance from Christine or Matthew.  Apparently in a letter written to Christine's employer at the time, Susan expressed her frustration and belief that Christine was living at 11 Fowler rent free and had financially benefitted to the extent of approximately $18,000.  Susan emphasized at trial, however, that her calculation was mere speculation.  She also maintained that 11 Fowler should be solely in her name as she possessed an unrecorded deed to the property.  This unrecorded deed, however, was apparently only signed by Susan.

not have any credit history or any experience with mortgage applications and, believing that the Mullarkeys were more financially sophisticated then she, relied on Matthew's representations.[3]  Christine testified that, at all relevant times, she believed that she was a one-half owner of 11 Fowler and responsible for half of the financing arrangement.

This oral agreement, according to both Christine and Susan, required that Susan be paid $10,000 from the refinancing and then Christine and Matthew would each pay Susan an additional $2,500 - for a total of $15,000.  Matthew, however, maintains that the agreement was always for him to have sole ownership of 11 Fowler.  He testified that there was no arrangement to share ownership with Christine; that when he moved to Massachusetts with his family, he had significant proceeds from the sale of the California residence and, in April or May of 2004, told Christine and Susan that "the only way [he] would put that money into Fowler Ave. was if [he] was the sole owner, and so it was – had to be agreed by everyone that they would sign over their part of the house in order for [him] to do that."  More specifically, he testified that "[i]n order for me to move in and refurbish the house . . . they would both need to sign off of the deed."  Matthew testified that Susan initially wanted $20,000 for her interest in the property but eventually agreed to accept $12,500 from him.  And Christine agreed to take the sum of $7,250 in full payment of the moneys that Todd advanced on roofing materials and travel expenses associated with the 2003 roof repair.  According to Matthew, Christine agreed to convey her interest in the

---

[3]  At the time of these discussions, Christine was a nursing student and taking courses at a local community college.  She believed the Mullarkeys were financially knowledgeable as they had been involved in two residential property transactions while in California and previously owned other valuable personal property.  Matthew testified, however, that during both California real estate transactions, Nicole "did everything" and just "told [him] where to sign."

Fowler Property for (1) $7,250, (2) fixed rent until she finished nursing school, and (3) the right to choose the floor in which her family would live.

Nicole's testimony echoed that of her husband.  She testified that Matthew had told her, "before he would sink any of our money into the house he was going to buy out his sisters, and then we would go ahead and he was going to remodel it, and make sure that it was okay, that he put the money that we invested."  She stated there were two or three discussions "to work everything out," but only Matthew, Christine and Susan were involved in the discussions.[4]  Her recollection of the events was that Susan had advanced sums for repairs at 11 Fowler totaling about $12,000 or $12,500 and Christine and Todd had advanced similar sums totaling $7,200.

Ultimately, Nicole contacted Countrywide Home Loans, Inc. ("Countrywide") for the purpose of securing financing in Matthew's name.  Matthew testified that his wife was responsible for their family finances and that although she and Matthew usually made decisions together, Nicole usually "did the footwork."

**The Transfer:** On June 25, 2004, Matthew, Christine and Susan conveyed 11 Fowler to Matthew for the sum of $1.[5]  And on the same date, Matthew, in turn, granted a mortgage in the amount of $115,000 to Countrywide, whose agents had appraised the property for $180,000.  Of the mortgage proceeds, $80,026.21 was used to pay off the existing mortgage to United Cooperative Bank held in Lenore Mullarkey's name; $5,695.77 paid the closing costs and other settlement charges; and $29,578.02 was available to the

---

[4]  Nicole testified that she was aware of the agreement between Christine, Susan and her husband and was within earshot of some of the conversations, but never participated.

[5]  Matthew, Susan and Christine were all present at the real estate attorney's office at the closing. Christine testified that she did not receive the $1 referenced on the deed.

sellers.  Of that surplus, Matthew received slightly less than $13,000, Christine received

$7,250[6] and Susan received $10,000.

Also at the time of the June 25, 2004 closing, Christine provided Susan with a signed

promissory note, dated June 24, 2004, which read:

> I Christine N Scanlon agree to pay Susan LeBlanc an amount of $2500 on
> or before June 24, 2007.  An amount agreed upon by both parties involved.

Matthew also provided Susan with a signed promissory note dated June 24, 2004.  His note

read:

> I Matthew J Mullarkey agree to pay Susan LeBlanc the total amount of
> $12,500. $10,000 of that shall be paid at the time of closing/refinancing 11
> Fowler Avenue in Westfield, MA.  The remainder of the funds a total of $2500
> shall be paid to her as of/or before June 24, 2007.  In turn Susan has agreed
> to relinquish her right of ownership to 11 Fowler Avenue in Westfield MA
> 01085.

Both promissory notes were prepared by Nicole.  She  testified that Matthew and Christine

separately requested that she prepare notes on their respective behalf but denies that she

understood at that time the details of the underlying transaction.

Soon after the closing, Matthew and Christine opened a joint checking account for

the purpose of paying the mortgage, water bills, and other property expenses at 11 Fowler.

Nicole testified that the joint account was opened at Matthew's suggestion.[7]  Christine

---

[6]  Christine testified that the proceeds paid to her were used to make renovations to the second floor
and for the purchase of some furnishings.  Specifically, Christine testified that her family renovated the
bathroom, added a new rug to the living room, gutted the dining room, installed new ceiling fans and hardwood
floors and repainted rooms.  Matthew assisted Christine with some of those renovations.

[7]  Although Matthew wrote the majority of checks from the joint account, between August 13, 2005
and the date the account was closed on December 18, 2006, Christine signed the following checks: check
number 535 dated November 5, 2005 payable to Countrywide in the amount of $1,407.33, check number 536
dated December 2, 2005 payable to Nicole in the amount of $230, check number 564 dated January 27, 2006
payable to the City of Westfield in the amount of $316.17, check number 569 dated May 19, 2006 payable to
Jelly Belly Pools in the amount of $205.57, and check number 542 dated September 8, 2006 payable to
Ocean State Job Lot in the amount of $156.36.

testified that at that time, she was contributing $640 monthly to the account, representing her half of the mortgage payment and a contribution to the cost of water.  She subsequently increased that monthly payment by $50 to address higher than anticipated water charges.

Christine testified that she asked Matthew "every few months" as to when her joint interest in the Fowler Property would be returned to her, but was put off.  Susan added that she had several conversations with Matthew and Nicole during this time period, and Matthew and Nicole never questioned whether Chistine's name would be added to the deed.  In fact, she recalled one specific conversation in the Spring of 2005 between Susan, the Mullarkeys, Christine and Todd (together, the "Greenes") in which Matthew indicated that after Christine was married, the deed to 11 Fowler would be changed to reflect joint ownership by the Mullarkeys and the Greenes.  Nicole, however, testified that she did not recall those conversations.

In each subsequent year commencing with the 2004 transfer, the Mullarkeys added Schedule E to their joint 1040 tax return to report, with respect to the Fowler Property, rents received; insurance, mortgage interest, utilities and taxes paid; and depreciation or depletion expense - in each case receiving a tax benefit from the losses reported.

**The Subsequent Mortgages:** On October 12, 2004, allegedly in need of funds to pay certain hospital bills and living expenses, Matthew borrowed an additional sum of $28,700 from Countrywide (the "October 2004 Loan") and granted Countrywide a second mortgage on the Fowler Property to secure repayment.  Matthew testified that he and Nicole had gotten "over [their] heads" with the cost of the renovations made to the property and attributed his hospitalization to the effect of working too many hours on those renovations and as a subcontractor on other projects.

8

On July 20, 2005, Matthew entered into a new financing arrangement with Countrywide, this time refinancing into a new loan in the amount of $181,500 (the "July 2005 Mortgage").  This new mortgage paid off the two prior Countrywide mortgages in amounts of $114,248.85 and $28,836.87, respectively, and also satisfied the Mullarkeys' outstanding credit card obligations totaling $31,153.  Matthew also received an additional $3,993.54 of loan proceeds but was unable to identify at trial where these funds were spent.  Again, Matthew testified that he and his wife had gotten "over our heads" specifically in respect to the home renovations.

And, on November 16, 2006, Matthew borrowed an additional $20,000 from TD Banknorth, N.A., again securing the repayment with a mortgage on the Fowler Property (the "November 2006 Mortgage" or the "TD Bank Mortgage").[8]  Of these loan proceeds $14,455.47 was again used to satisfy outstanding credit card obligations and $5,544.53 was disbursed directly to Matthew.

Christine testified, and this Court finds, that she did not receive any of the proceeds from the additional mortgage loans nor was she aware of their existence until after they were completed.  According to Christine, in the fall of 2005, Nicole admitted that she and Matthew had taken some money out of 11 Fowler and because of the new mortgage, Christine would need to wait an additional six months to be put back on the deed.  Christine testified that Nicole reassured her that Christine would not be responsible for the additional mortgage obligations and her payments to the house account would remain the same. Nicole denied ever having such a conversation with Christine.

---

[8]  In connection with this loan, the property was reappraised in the amount of  $282,000.

9

**Living at 11 Fowler:** During the late spring and summer of 2004, Matthew gutted the first floor of 11 Fowler down to the exterior walls and repaired, updated or replaced all of the electrical, plumbing, insulation, drywall, and baseboard heaters.  Matthew testified that he would not have moved his family into 11 Fowler without the extensive renovation. Both Christine and Susan testified, largely supported by Lenore Mullarkey, that, in their opinion, repairs to the first floor had been unnecessary.   Yet Matthew submitted into evidence receipts totaling approximately $45,000, dated between May 1, 2004 and February 15, 2008.   He also estimated that the value of his labor was approximately $40,000.

The Mullarkeys and their children moved into the first floor of 11 Fowler in September 2004.  However, by the summer of 2006, significant animosity had developed between the Greenes and the Mullarkeys, arising from perceived resentments about the maintenance of the property, e.g., lawn maintenance and trash pickup.[9]

In or around October 2006, Matthew approached Christine, explaining that he was having financial difficulty paying for a new health insurance expense.  Christine claims that Matthew asked her to increase her monthly payment.  She testified that she told him she was willing to increase her payment to benefit 11 Fowler but not if the funds were to cover Matthew's personal financial obligations.  Soon thereafter, Matthew provided Christine with a letter, dated October 29, 2006, which provided with respect to her residence at the Fowler Property:

---

[9] Susan testified that Matthew had told her during this period, referring to Christine and the maintenance of 11 Fowler, "Well, I'd put her back on the deed if she would freaking do something around here."

This is a month to month lease that will go into affect as of November 1, 2006.  The increase of rent from $690 to $1000 goes into effect by December 1, 2006.  Please return this to me by Tuesday October 31, 2006.  If you have any questions just ask.

The Greenes subsequently received  a "Notice to Vacate for Possession - Without a Lease," dated December 14, 2006.  In the Notice, the Greenes were "requested to leave the premises you now rent as my tenant" with Matthew signing as "landlord."  Christine testified that these occasions were the first in which her monthly payments were classified as rent.

During this same period, Matthew listed 11 Fowler for sale, arranging for a "For Sale" sign to be posted in front of the property.  Matthew testified that he put the property up for sale because it was in much need of repair and he did not want to go through the process of evicting the Greenes.[10]  On December 18, 2006, Matthew closed the joint checking account and withdrew the remaining funds.[11]

After seeing the "For Sale" sign in front of 11 Fowler, Christine decided to move her dispute with Matthew to a courtroom and filed a complaint and request for *lis pendens* in the Hampden County Superior Court.  The request for *lis pendens* was granted on December 21, 2006.  And after the closure of the joint account, Christine began sending

---

[10]  Matthew testified that the house required new siding, new windows, and a driveway repair; and that the funds realized from October 2006 Mortgage were acquired for the specific purpose of fixing things on the property in advance of sale advertising.

[11]  Christine testified that at the time of closing the account, there were enough funds to make the next mortgage and water payments.  According to the bank statements submitted into evidence, $365.79 was withdrawn at closeout on December 18, 2009 but in the prior month Matthew signed the following checks: check number 547 payable to Nicole Mullarkey in the amount of $400, check number 548 payable to the City of Westfield in the amount of $336.14, check number 549 payable to Nicole Mullarkey in the amount of $1,000, and check number 592 payable to Matthew Mullarkey in the amount of $230.

her monthly mortgage payments directly to Countrywide and contributed to the water bill by periodically paying a portion of the outstanding balance.

In the years following the commencement of the state court litigation, the relationship between the parties did not improve.  Slights, real and perceived, included the following:

1) Christine accused the Mullarkeys of having taken the Greenes' children's baseballs and a chaise lounge.  She testified that the items were returned only after a motion for preliminary injunction was granted on or about June 20, 2007, requiring the Mullarkeys not to interfere with the personal property of the Greene family or with their use and enjoyment of 11 Fowler.  Susan testified that in the summer of 2006, prior to the preliminary injunction, Matthew installed a fence around the in-ground pool and that, after the injunction was granted, Matthew erected a larger fence with a lock in order to restrict her family's access.  Matthew, citing a perceived ambiguity in the state court injunction, testified that he, as the sole owner, had concern about unfettered use of pool for liability reasons and was authorized to restrict access.

2) Christine claimed that Matthew removed an outdoor water faucet to prevent her family from having access to water while in the yard.  Because her family was denied access to the pool, Christine testified that she purchased an inflatable pool and had to fill it with a hose from their residence on the second floor.

3) Christine complained that her family was denied access to the basement which contains the circuit breaker box and water controls for all of 11 Fowler.  The Mullarkeys countered that a freezer owned by Christine, her sports equipment and leftover drywall from the Greenes' own bathroom renovation was positioned in front of the Greenes' basement access.  Matthew admitted, however, that no one, other than his family, currently

has unlocked access to the basement.   He contended that the basement stairwell accessible by the Greenes was latched shut from the Greenes' side to prevent heat loss but that, once the litigation began, the Mullarkeys secured access from their side in order to protect tools and expensive game equipment located in the basement.  Nicole testified that she considers the basement part of their home.  The Mullarkeys also testified that their children played and would, on occasion, sleep in the basement.  They claimed that Todd, at one point, kicked in a bulkhead basement access in order to reach the electrical switches and/or water controls when Matthew was not home.

4) Christine claimed that the Mullarkeys removed an old outdoor gas grill from the property without her or Todd's permission.  Matthew explained that his father-in-law brought the grill to the dump by mistake when he was at 11 Fowler to retrieve other debris.  According to Matthew, the grill was located in an area where people do not normally grill and he did not ask anyone to remove the grill nor was he aware of its disposal until after it was removed.

5) Susan testified that Matthew removed a basketball hoop from the garage which was often used by Christine's children.   Matthew claims that the hoop was removed because he intended to re-side the garage and it was precariously located above where vehicles were often parked.  Matthew further testified that it was he who originally installed the hoop when he was approximately ten years of age.

6) Susan testified that on Christmas Day 2006, Matthew cut down a tree holding a tire swing often used by Christine's children.  Christine also accused the Mullarkeys of removing Christmas decorations belonging to Christine's family.  Nicole, however, testified that the decorations were removed because she is a Jehovah's Witness and does not

celebrate Christmas and that they were placed on the Greenes' side of the garage after the Mullarkeys consulted with their attorney.

7) Christine claimed that Nicole videotaped her actions when coming and going from the house, called her "lazy" in front of her daughter, and left a voicemail on her phone accusing Todd of allowing the garage to flood.  In that same voicemail, Nicole stated that Todd's laziness "is why we called the attorneys and why we will never own with you." Nicole admitted to leaving the voicemail out of anger because she believed that the Greenes had shoveled snow into a sump pump hole, flooding the garage during a heavy freezing rain.

8) Christine complained that during a July 2007 graduation party for her daughter at which approximately fifteen persons were in attendance, she inadvertently tripped an electric circuit which caused a power outage to a portion of the living space in her residence.  Christine testified that Nicole used pretextual excuses and delayed resumption of power from the circuit box (to which the Mullarkeys alone had access) for hours.

9) Both Christine and Susan testified that during this same graduation party, Susan's son parked his vehicle in front of 11 Fowler and Matthew intentionally repositioned a sprinkler to spray water into the vehicle.

10) Christine also claimed that when Todd, a licensed pipefitter, attempted to make a repair to a washing machine valve which was leaking water into the Mullarkeys' residence, Matthew initially refused to turn off the water.  And then after agreeing to do so, Matthew would periodically turn the water on for the specific purpose of spraying Todd. According to Susan's testimony, Matthew then refused to turn the water back on after the repair and only did so after police involvement.  Nicole tells a different story.  She tesified

14

that, on that day, she called her husband at work to inform him about water leaking through their recessed lighting.  Matthew testified that he then contacted Christine about the leak and Christine later left a message on the Mullarkeys' answering machine requesting that water be shut off in order to make the necessary repairs.  The Mullarkeys, however, claim that Todd attempted to fix the leak without waiting to have the water turned off and water leaked from second floor all the way into the basement.  Matthew testified that water has leaked from the Greenes' apartment on prior occasions and he attributed this to the Greenes' unfinished bathroom renovation.

**The Bankruptcy:** The Mullarkeys ultimately filed for relief under Chapter 7 of the Bankruptcy Code on December 19, 2007.  On Schedule A, the Mullarkeys disclosed Matthew's ownership of 11 Fowler, subject to a *lis pendens*, and valued the property at $200,000 with secured claims totaling $295,515.  Christine was listed on Schedule F as holding an unliquidated and disputed unsecured claim in the amount of $100,000.

In their Statement of Intent, the Mullarkeys represented their intention to reaffirm the mortgage debts owed to both Countrywide and TD Bank.  On March 14, 2008, Matthew filed a reaffirmation agreement with respect to the TD Bank Mortgage but no such reaffirmation agreement was filed regarding the Countrywide obligation.  Three days later, on March 17, 2008, Christine filed the instant adversary proceeding alleging her claims of nondischargeablity.  On May 2, 2008, the Mullarkeys received their chapter 7 discharge for all debts except the one allegedly owed to Christine.

## II.    POSITIONS OF THE PARTIES

Christine sets forth three grounds to justify the nondischargeability of her claim against the Mullarkeys.  First, she maintains that the Mullarkeys committed defalcation while acting in a fiduciary capacity and engaged in an act of embezzlement, both grounds for nondischargeability under § 523(a)(4).  She contends that Matthew failed to abide by his agreement to reconvey to Christine her interest in 11 Fowler after he had secured new financing and she was married to Todd.  In addition, she maintains that Matthew, in violation of his fiduciary obligations to her, fully mortgaged 11 Fowler's remaining equity to satisfy his personal outstanding credit obligations and ultimately attempted to sell the property.  Second, as justification for her § 523(a)(2)(A) grounds, Christine alleges that Matthew never intended to abide by his aforesaid agreement and deceived Christine into relinquishing her interest in the property.  Christine contends that she justifiably relied upon Matthew's statements and incurred significant damages - loss of possession, substantial equity, available tax deductions, and the value of her improvements.  Finally, Christine collects the various examples of occasions in which she believes the Mullarkeys engaged in willful and malicious harassment and retaliation seeking to induce her family to vacate the premises and punish her for refusing to increase her monthly payments; argues that such acts have violated Massachusetts General Laws ("Mass. Gen. Laws") ch. 184, § 18 and ch. 186, §§ 14 and 18; and seeks to establish a non-dischargeable claim under § 523(a)(6) in the amount of statutory state law damages - three months market rent plus reasonable attorney's fees.

Of course, the Mullarkeys view the foregoing events quite differently.  They maintain that Matthew never agreed to hold 11 Fowler in trust for Christine; rather Christine and

16

Susan simply agreed to transfer the property into Matthew's name in exchange for monetary compensation - which was paid.  The Mullarkeys further contend that even were the Court inclined to find that Matthew agreed to hold the property in trust for Christine, her claims are barred by the doctrine of unclean hands.  They assert that Christine's own version of the facts - that Matthew convinced her and Susan to transfer their interest solely to him in order to receive the better financing, and then, subsequent to refinancing, would reconvey her property interest - describes a conspiracy to defraud Countrywide.

Defending against the Plaintiff's allegations of actual fraud under § 523(a)(2)(A), the Mullarkeys reiterate that there was no such agreement and maintain that even if the Court found that such an agreement did exist, Christine failed to demonstrate by a preponderance of the evidence that Matthew intended *at the time of the agreement* not to reconvey Christine's interest in 11 Fowler to her.  And, although acknowledging some of the factual circumstances surrounding the Plaintiff's § 523(a)(6) claim, the Mullarkeys maintain that all of their actions were justified as they were acting under color of title and none of the actions complained of would rise to the "willful" and "malicious" standard for nondischargeability as set forth in § 523(a)(6).  Finally, the Mullarkeys contend that even if the Court finds in favor of Christine on any of her theories, Nicole should spared from that determination as there is no evidence to support a finding of culpability on her part.

## III.  __DISCUSSION__

The First Circuit has clearly articulated the competing equitable interests to analyzing exceptions to discharge under the Bankruptcy Code.  On the one hand, in furtherance of the Bankruptcy Code's 'fresh start' policy, "[e]xceptions to discharge are

17

narrowly construed . . . and the claimant must show that its claim comes squarely within an exception enumerated in [§ 523(a)]." McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 (1st Cir. 2001) (quoting Century 21 Balfour Real Estate v. Menna (In re Menna), 16 F.3d 7, 9 (1st Cir. 1994)); Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997) (quoting same).  By specifying the types of debts that the Bankruptcy Code considers exempt from discharge, it does not condition discharge upon a generalized determination of the moral character of the debtor.  In re Spigel, 260 F.3d at 32.  On the other hand, "[b]y seeking discharge . . . [the debtor] places the rectitude of his prior dealings squarely in issue, for . . . th[e] opportunity [for discharge is limited] to the 'honest but unfortunate debtor.' "  Id. (quoting Brown v. Felsen, 442 U.S. 127, 128 (1979) (citation omitted)).

## A.      11 U.S.C. § 523(a)(4)

Pursuant to § 523(a)(4), an individual debtor can not discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).  In order to establish an exception to discharge under § 523(a)(4), a creditor bears the burden of proving each and every element by a preponderance of the evidence. Rutanen v. Baylis (In re Baylis), 313 F.3d 9, 17 (1st Cir. 2002) (citing Grogan v. Garner, 498 U.S. 279, 291 (1991)); Palmacci, 121 F.3d at 787.

"The definition of 'fiduciary' for purposes of § 523(a)(4) has been narrowly construed. The term applies only to relationships arising out of express or technical trusts, and not to trusts that are implied in law as a remedy."  Moore v. Murphy (In re Murphy), 297 B.R. 332, 348 (Bankr. D. Mass. 2003) (citation omitted).  Federal law controls who is considered a fiduciary for § 523(a)(4) purposes, although state law is relevant to determining whether a trust relationship exists.    Kwiat v. Doucette, 81 B.R. 184, 188 (D. Mass. 1987).

Furthermore, the trust relationship must exist prior to the act creating the debt.  <u>Davis v.</u>
<u>Aetna Acceptance Co.</u>, 293 U.S. 328, 333-34 (1934).

An express trust "requires a declaration of trust and intent to create a trust
relationship with respect to a clearly defined res."  <u>Staniunas v. Delisle (In re Delisle)</u>, 281
B.R. 457, 466 (Bankr. D. Mass. 2002) (<u>quoting</u> <u>Stowe v. Bologna (In re Bologna)</u>, 206 B.R.
628, 632 (Bankr. D. Mass. 1997)).  Under Massachusetts state law, an express trust exists
if there is: 1) intent to create a trust, 2) a specific trust res, and 3) identifiable beneficiaries.
<u>Bane v. LeRoux (In re Curran)</u>, 157 B.R. 500, 509 (Bankr. D. Mass. 1993) (<u>citing</u> <u>Ventura</u>
<u>v. Ventura</u>, 407 Mass. 724, 727-28 (1990)).

> An express trust, often created by an oral statement, depends primarily on
> the manifestation of intent to create a trust. A party seeking to establish a
> trust need not use specific terminology; instead, the party must unequivocally
> intend that the estate vest in one person to be held in some manner or for
> some purpose on behalf of another. <u>See</u> <u>Ventura v. Ventura</u>, 555 N.E.2d 872
> (Mass. 1990).

<u>Nickless v. Clemente (In re Clemente)</u>, Ch. 7 Case No. 07-42648-JBR, Adv. No. 07-4160,
slip op. at 13 (Bankr. D. Mass. August 12, 2009).

The Massachusetts statute of frauds is here implicated as well, as the statute
applies to trusts concerning real property.  As a general rule, "[n]o trust concerning land,
except as may arise by implication of law, shall be created or declared unless by a written
instrument signed by the party creating or declaring the trust or by his attorney."  Mass.
Gen. Laws ch. 203, § 1.  "If one orally agrees to hold land in trust for another an express
trust is created; . . . this oral trust is unenforceable . . . because the statute of frauds
requires that trusts concerning land, except those which arise or result by implication of law,
mut be evidenced by a written memorandum."  <u>First Nat'l Bank of Boston v. Richmond (In</u>

re Gustie), 32 B.R. 466, 471 (Bankr. D. Mass. 1983), aff'd 36 B.R. 473 (D. Mass. 1984).

The statute of frauds is not without situational exceptions, however. "[A]n oral agreement to convey land may be specifically enforced in equity, notwithstanding the statute of frauds, where the agreement has been partly performed by the parting seeking to enforce it, by taking possession and making improvements upon the estate, . . . so that he cannot be restored to his original situation." Hazleton v. Lewis, 267 Mass. 533, 538-39 (1929) (quoting Derby v. Derby, 248 Mass. 310, 314 (1924)). A plaintiff's part performance of, or detrimental reliance on, an oral agreement to convey property may estop a defendant from pleading the statute of frauds. Nessralla v. Peck, 403 Mass. 757, 761 (1989) (citations omitted). "This rule applies with particular force where the plaintiff has already provided consideration consisting, at least in part, of an interest in land." Barber v. Fox, 36 Mass.App.Ct. 525, 530 (1994).

This Court found credible the testimony of Christine, Susan and Lenore Mullarkey and the testimony of Matthew and Nicole considerably less so. Accordingly, this Court finds that Matthew *and Nicole* assumed an express trust to have Matthew hold title to the Fowler Property on behalf of Christine and to return her interest of record after the June 25, 2004 refinancing of the property and Christine's marriage. Beyond the Court's observation of the testimony of the witnesses, the Court found there to be no cogent reason for Christine's execution of a $2,500 promissory note to Susan (prepared by Nicole) other than for a benefit to be received by Christine (i.e., a share of Susan's interest in the Fowler Property). Nor did the Court find credible the Mullarkeys' testimony that Christine was paid $7,250 from the refinancing to reimburse her and Todd for the monies paid for the 2003 roof repair. Christine's uncontradicted testimony was that more than that sum was spent

20

towards the repair and related travel expenses. Nor did the Court believe that the Greenes, if truly tenants of Matthew, would spend thousands of dollars to renovate the second floor of 11 Fowler if Christine would thereafter have no ownership interest in the property.

The oral agreement to reconvey a one-half interest in 11 Fowler constituted an express trust pursuant to Massachusetts law: Christine was the intended beneficiary, the one-half interest in Fowler Property was the trust res, and Matthew and Nicole were the trustees.

The evidence clearly established that Nicole remained in the background, but was "pulling the strings." Matthew testified that Nicole arranged both the financing and actually drafted the promissory notes for himself and Christine to Susan. As Matthew testified in metaphor, she just "told him where to sign." Nicole did the footwork, yet pretended not to understand the transactions in which she was actively participating. Christine had no credit and had no prior experience with mortgages - facts known by the Mullarkeys. The Mullarkeys had greater financial sophistication than did Christine and Christine relied upon them and specifically upon Nicole with whom she had grown close.[12] Nicole herself testified at trial that Christine and Matthew had not been close since childhood and rarely spoke to one another. By virtue of her participation in and, to a large extent, control over the transactions between Matthew, Christine and Susan, Nicole sought the benefits of Matthew's promises to Christine, participated in their breach and should not now be shielded from the consequences.

---

[12] Christine also testified that Nicole was intimately aware of her individual finances as they had many personal conversations during Christine's divorce with her first husband, and, incident thereto, Nicole accompanied Christine to an attorney's office, and actually aided Christine in filling out financial forms.

21

This Court has no difficulty whatsoever finding and ruling that, having established the existence of a fiduciary relationship between Matthew and Nicole as fiduciaries and Christine as beneficiary, the Mullarkeys' actions constituted "defalcation" within the meaning of § 523(a)(4).

The First Circuit extensively examined the standard for defalcation under § 523(a) in the case of Rutanen v. Baylis (In re Baylis), stating:

> [W]e find that a defalcation requires some degree of fault, closer to fraud, without the necessity of meeting a strict specific intent requirement. . . . We believe that defalcation lessens the threshold requirement from one of criminal or civil fraud to something less. To show defalcation, a creditor need not prove that a debtor acted knowingly or willfully, in the sense of specific intent. However, a creditor must be able to show that a debtor's actions were so egregious that they come close to the level that would be required to prove fraud, embezzlement, or larceny. A debtor fiduciary may not escape the exclusion from discharge of his debt arising out of defalcation by saying he had no specific intent. As in other areas of the law, circumstances will provide the level of wrongdoing needed to constitute a defalcation.

313 F.3d 9, 18-21 (1st Cir. 2002). Explaining further:

> In evaluating whether there is a defalcation of a fiduciary duty, there must be reference to the duty involved. Of the various duties, the duty of loyalty is "[t]he most fundamental duty owed...the duty of a trustee to administer the trust solely in the interest of the beneficiaries." 2A A. Scott, The Law of Trusts § 170 (W.F. Fratcher ed., 4th ed. 2001). Defalcation may be presumed from breach of the duty of loyalty, the duty not to act in the fiduciary's own interest when the interest comes or may come into conflict with the beneficiaries' interest:
>
> > A trustee occupies a position in which the courts have fixed a very high and very strict standard for his conduct whenever his personal interest comes or may come into conflict with his duty to his beneficiaries. As long as he is not acting in his own interest the standard fixed for his behavior is only that of a reasonable degree of care, skill, and caution. But when the trustee acts in his own interest in connection with the performance of his duties as trustee, the standard of behavior becomes more rigorous. In such a case his interest must yield to that of the beneficiaries.

2A *id.* § 170.25.  As with the other fault-based exceptions, fault may be presumed from the circumstances, here a violation of the duty of loyalty."

Id. at 20-21.  Defalcation is not the result of every breach of fiduciary duty and it is to be measured objectively.  Id. at 17-18.  Here, Matthew had a duty to reconvey title in 11 Fowler back into both his and Christine's names.  On more than one occasion, both Christine and Susan inquired about when Matthew would preform that duty, but were informed that Christine needed to wait until some point in the future.  It was not until Christine refused to increase her mortgage payment in the fall of 2006 that she was informed of her "tenant" status.  Regardless of whether their intent was to rob Christine of her interest in the Fowler Property from the outset, the Mullarkeys violated the fiduciary duty to Christine (which they voluntarily assumed) by conspiring to retain the property soley in Matthew's name and in extracting its equity through new mortgages to subsidize their lifestyle.  These actions easily satisfy the First Circuit standards for "defalcation" under § 523(a)(4).

The Massachusetts statute of frauds does not shield the Mullarkeys.  Reliance and part performance negate the effect of the statute.  Christine acted in reliance on the promise that her interest in the Fowler Property would be returned to her by transferring her interest in the property to Matthew.  She invested thousands of dollars of funds in the Fowler Property for substantial renovations to her living area.  She entered into a joint bank account with her brother for the purpose of paying the mortgage and other property expenses, even writing the mortgage check from the account on one occasion.  See McDonnell v. McDonnell, No. 013421, 2005 WL 1156203, at *3 (Mass. Super. Apr. 29, 2005) (an exception to the statute of frauds is appropriate where the plaintiff deeded his

interest to the defendants and the transfer "irretrievably changed" the plaintiff's position to his detriment in reliance upon the defendants' promise); Hazleton, 267 Mass. at 538-40 (improvements made to the premises must have been induced by the agreement and in reliance upon its performance and that the improvements must have been substantial).

The Mullarkeys similarly cannot shield themselves with the equitable doctrine of unclean hands. The unclean hands doctrine is a "self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper have been the behavior of the defendant." Precision Instrument Mfg. Co. et al. v. Auto. Maint. Mach.Co., 324 U.S. 806, 814 (1945). The saying "'he who comes into equity must come with clean hands' of necessity gives wide range to a court's use of 'discretion to withhold punishment of behavior which it considers not to warrant so severe a sanction.'" K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 912 (1st Cir. 1989) (citations omitted). The doctrine "only applies when the claimant's misconduct is directly related to the merits of the controversy between the parties, that is, when the tawdry acts 'in some measure affect the equitable relations between the parties in respect of something brought before the court".'" Texaco Puerto Rico, Inc. et al. v. Dep't of Consumer Affairs et al., 60 F.3d 867, 880 (1st Cir. 1995) (quoting Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245 (1933)). Based upon this Court's review of the circumstances surrounding the agreement between the parties and the refinancing, Christine's participation does not fall under the doctrine. It is undisputed that the agreement to have Matthew as the sole title holder to secure a better interest rate was at the Mullarkeys' suggestion and that Christine had no prior mortgage experience. But of greater moment, there was no evidence that Countrywide was actually defrauded

24

or if it played any active role in suggesting the nature and form of the transaction. Without more, there is no foundation for application of the doctrine of unclean hands in this case.[13]

### B. 11 U.S.C. §§ 523(a)(4)(Embezzlement), 523(a)(2)(A) and 523(a)(6).

Having determined that Christine's claims against the Mullarkeys are not dischargeable under § 523(a)(4) on account of the Mullarkeys' defalcation of their fiduciary duty to Christine, this Court need not "gild the lily" by ruling on the applicability of §§ 523(a)(2)(A)[14] and (a)(6) to the same events or whether the elements of "embezzlement" are also present.[15]

---

[13] In further support of applying the unclean hands doctrine and an equitable affirmative defense, the Defendants cite directly and indirectly to Mass. Gen. Laws ch. 109A, the Uniform Fraudulent Transfer Act. However, this statutory scheme aims to protect creditors from a debtor's fraud and invalidate fraudulent transfers and obligations. See Mass. Gen. Laws ch. 109A,§ 5(a) (1996); 37 C.J.S. Fraudulent Conveyances § 43 (2009). The creditor allegedly defrauded through the agreement, according to the Mullarkeys, is the bank. But the bank is not a party to these proceedings nor has it has not alleged any fraud. Further, the initial mortgage which was taken as the result of this alleged fraudulent agreement in June 2004 no longer exists as the Mullarkeys entered into the July 2005 Mortgage which paid off the two prior mortgages.

[14] Section 523(a)(2)(A) excepts from discharge a debt of an individual debtor "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by - false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

[15] "Embezzlement has been defined 'as the fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come.'" Farley v. Romano (In re Romano), 353 B.R. 738, 765 (Bankr. D. Mass. 2006) (quoting Moore v. United States, 160 U.S. 268, 269 (1895)). To establish a claim of embezzlement, one must prove 1) the debtor's appropriation of property was for the debtor's benefit and 2) the appropriation occurred with fraudulent intent or by deceit. Id. (quoting KMK Factoring, L.L.C. v. McKnew (In re McKnew), 270 B.R. 593, 631-32 (Bankr. E.D.Va. 2001)).

Two matters do deserve separate treatment, however, with respect to § 523(a)(6).[16]

First, Christine argues that she is entitled to statutory damages under Mass. Gen. Laws ch.

186, §§ 14 and 18.[17]   Chapter 186, §§ 14 and 18 relate to inappropriate actions by

---

[16]   Section 523(a)(6) provides that debts will not be discharged if arising from "willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).  The Plaintiff must show that the Mullarkeys injured her or her property and that the injury was both "willful" and "malicious." As explained by the court in Burke v. Neronha (In re Neronha):

> "Willfulness" requires a showing of intent to injure or at least of intent to do an act which the debtor is substantially certain will lead to the injury in question.  Kawaauhua v. Geiger, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).  "Malicious" requires the injury to have been "wrongful," "without just cause or excuse," and "committed in conscious disregard of one's duties."  Printy v. Dean Witter Reynolds, Inc., 110 F.3d 853, 859 (1st Cir. 1997).

344 B.R. 229, 231 (Bankr. D. Mass. 2006).

[17]   Mass. Gen. Laws ch. 186, § 14 states in relevant part:

> Any lessor or landlord of any building or part thereof occupied for dwelling purposes, other than a room or rooms in a hotel, but including a manufactured home or land therefor, who is required by law or by the express or implied terms of any contract or lease or tenancy at will to furnish water, hot water, heat, light, power, gas, elevator service, telephone service, janitor service or refrigeration service to any occupant of such building or part thereof, who willfully or intentionally fails to furnish such water, hot water, heat, light, power, gas, elevator service, telephone service, janitor service or refrigeration service at any time when the same is necessary to the proper or customary use of such building or part thereof, or any lessor or landlord who directly or indirectly interferes with the furnishing by another of such utilities or services, or who transfers the responsibility for payment for any utility services to the occupant without his knowledge or consent, or any lessor or landlord who  directly or indirectly interferes with the quiet enjoyment of any residential premises by the occupant, or who attempts to regain possession of such premises by force without benefit of judicial process, shall be punished by a fine of not less than twenty-five dollars nor more than three hundred dollars ... Any person who commits any act in violation of this section shall also be liable for actual and consequential damages or three month's rent, whichever is greater, and the costs of the action, including a reasonable attorney's fee.

Mass. Gen. Laws ch. 186, § 18 states in relevant part:

> Any person or agent thereof who threatens to or takes reprisals against any tenant of residential premises for the tenant's act of, commencing, proceeding with, or obtaining relief in any judicial or administrative action the purpose of which action is to obtain damages under, or otherwise enforce, any federal, state or local law, regulation, by-law or ordinance, which has as its objective the regulation of residential premises; or exercising the tenant's rights pursuant to section one hundred and twenty-four D of chapter one hundred and sixty-four; or reporting to the board of health or, in the city of Boston to commissioner of housing inspection or to any other board having as its objective the regulation of residential premises a violation or a suspected violation of any health or building code or of any other municipal by-law or ordinance, or state or federal law or regulation which has as its objective the

26

landlords. Christine can not have it both ways. She is either owner or tenant. This Court having established that she has the rights of the former, she can not seek remedies available to the latter.

Second, Christine's § 523(a)(6) claims turn in part on her assertion that the Mullarkeys engaged in retaliatory behavior toward her and members of her family. She also maintains that those actions violated Mass. Gen. Laws ch. 184, § 18.[18] But this Court finds that Christine failed to demonstrate, by a preponderance of the evidence, that the Mullarkeys' actions in the day-to-day affairs of operating the Fowler Property were either intended to harm Christine or members of her family or were not otherwise justified. In several cases, these actions appear to have been misinterpreted by Christine. In any event, the Mullarkeys' actions in this respect, individually and collectively, did not satisfy the "malicious" element of § 523(a)(6) or the proscription of state law. Accordingly, in this regard, Christine has not satisfied her burden of proof.

---

regulation of residential premises; or reporting or complaining of such violation or suspected violation in writing to the landlord or to the agent of the landlord; or for organizing or joining a tenants' union or similar organization, or for making or expressing an intention to make, a payment of rent to an organization of unit owners pursuant to paragraph (c) of section six of chapter one hundred and eighty-three A shall be liable for damages which shall not be less than one month's rent or more than three month's rent, or the actual damages sustained by the tenant, whichever is greater, and the costs of the suit, including a reasonable attorney's fee.

[18] Mass. Gen. Laws ch. 184, § 18 states in part:

No person shall make an entry into land or tenements except in cases where his entry is allowed by law, and in such cases he shall not enter by force, but in a peaceful manner.

No personal shall attempt to recover possession of land or tenements in any manner other than through an action brought pursuant to chapter two hundred and thirty-nine or such proceedings authorized by law.

IV.    **CONCLUSION**

The Court finds and rules that Christine has established, by a preponderance of the evidence, that she has a nondischargeable claim against Matthew and Nicole, pursuant to § 523(a)(4).  In addition, Christine seeks in the Complaint a declaration that she is joint owner of the Fowler Property.  In her proposed findings of fact and law, Christine offers various permutations of remedies suggested to make her whole.  None does the trick of returning Christine to the position of a joint owner of 11 Fowler subject to the indebtedness of 2004 refinance alone.  That debt has been paid, other mortgages have been incurred and the Fowler Property has fluctuated in value.  Accordingly, the remedy must do so as well.

In view of the foregoing, this Court will (1) declare that Christine owns a fifty (50%) undivided interest in the Fowler Property; (2) order Matthew to convey that interest to Christine as of record as a tenant in common and pay for the applicable recording costs and fees; and (3) adjudge that Christine shall thereafter hold a nondischargeable claim[19] against Matthew and Nicole in an amount equal to fifty (50%) percent of the difference between a) the value of the Fowler Property and b) the total of i) closing costs, ii) an amount equal to the $115,000 June 25, 2004 mortgage had that mortgage alone been amortized according to its orginal terms and iii) the amount which Christine shall receive as net proceeds on account of her interest in the property - all calculated as of the date, if ever, when the Fowler Property is liquidated or otherwise sold in an arms-length or non-

---

[19] This determination does not constitute a money judgment enforceable by execution from this Court. In the event that the Plaintiff would request such a money judgment from this Court, that request would be denied.  See Cambio v. Mattera (In re Cambio), 353 B.R. 30, 30-36 (1st Cir. B.A.P. 2004).

28

collusive foreclosure sale.[20]  Christine shall also have a nondischargeable claim against Matthew and Nicole in the amount of her attorney's fees and costs incident to this adversary proceeding.

A judgment in conformity with this opinion shall enter herewith.

By the Court,

Dated: August 13, 2009

Henry J. Boroff
United States Bankruptcy Judge

---

[20]  The Court acknowledges, but disregards, the $ 7,250 received by Christine incident to the June 2004 financing.  The Court finds that sum was paid to reimburse Christine and Todd for Todd's advances with respect to the work on the roof and not as consideration for conveyance of Christine's interest in the Fowler Property.